Our third case this morning is 18-15-87 Pacific Bioshares of CA v. ITC. Thank you, Your Honor. Thank you, Your Honor. Edward Reines on behalf of PAC-Bio. The ITC improperly included a synthesis step, it actually added a synthesis step to the patents in suit by misconstruing the claim term single molecule sequencing. The main argument is that the patent describes the invention as single molecule sequencing with a synthesis step. That is not so. And the main reason why that's not so, that I want to explain here today, is the hairpin invention of the patent, which is the innovation that's the subject of the claims and that's being infringed, is independent of how you do the sequencing itself, whether you use a synthesis step or you just do single molecules. Well, how do we know that? I mean, the problem is, and I guess you don't dispute this, that the specification only describes template sequencing and not nanopore sequencing. No, there's a subtlety there. So the experimental results that are shown are with the commercial product of PAC-Bio that includes a synthesis step. But there are definitely shown alternative approaches. There are, for example, magnetic particles, semiconductor crystals, basically the patent at column 7 says you can use a variety of ways of actually doing the sequencing. I think where the confusion comes in. Well, where does it say that? Column 7 at line 36 through 41. In preparing for argument, what I thought the concern was, this is an omnibus patent application that covers a whole variety of inventions. It's not a one invention thing. This is a major innovation. Wait, wait. Sure. This, in column 7, you're not contending that that includes nanopore sequencing, right? Well, I mean, down at, certainly at line 54, it specifies nanopore sequencing. And it refers to the Clark reference as an example. Well, it refers to nanopore sensors, not nanopore sequencing. That is the definition. If you have a nanopore sensor, then you're doing nanopore sequencing. There's no other, I mean, that's what it is. Well, the ITC found to the contrary, right? They ultimately concluded that reading this paragraph as a whole, what must be going on here is some version of synthesis. And then once you have your strands with your labels, you're then using the nanopore sensor. And then it's a little unclear in this spec whether you're using the sensor to identify the labels or an entire synthesized strand. Well, it references the Clark paper, which is a well-known paper in the field. So a person skilled in the art would know exactly what it is. It's undisputed by the ITC that what Clark shows is non-synthesis nanopore sequencing. That's in the ITC's brief at 36. So, nanopore, I mean, how much do you have to show? You actually have nanopore sequencing here. But the point that I want to raise is that this patent is an omnibus patent about a whole variety of different inventions. I'm sure there are inventions that involve synthesis. And the preferred environment was clearly the focus of the author. But what is critical here is to understand what the claimed invention is, which is the hairpin. And it doesn't, the brilliance of it is you have a single DNA where you take the double DNA strand and then you separate it out, you put a linker in, and you sequence one after the other. That has nothing to do with how the particular sequencing is done. In fact, and this is where this case would be unprecedented in my view, is in the prosecution history to demonstrate the unexpected benefits of the invention using the hairpin invention. It doesn't seem like there's even a debate about that. Again, the ITC decision itself says it's undisputed that Oxford uses the invention and gets great results with it. And that was what was cited in the declaration to show unexpected results. And so to say that the examiner looked at the publications of Oxford that definitely don't involve synthesis, that's in the record, and said, okay, this shows how great it works. And it's a non-synthesis reaction. And then it's granted on the basis of that. What if I look through that prosecution history discussion and see that based on the discussion between the applicant and the examiner, the focus is really on the construct of this strand, single strand with the hairpin, and it doesn't have anything to do. And so therefore the allowance isn't triggered based on what kind of sequencing is being used there, whether it's nanopore or whether it's synthesis or something like that. This is the whole point of what I'm trying to argue. And that's the whole focus, which is that the examiner granted the patent by saying this is great for single molecule sequencing. They were trying to claim it in their own patent. We have that in the record. They don't even deny it. They don't address it. It's good for single molecule sequencing regardless of whether synthesis is involved. But I guess for our purposes here, the real question is how do we understand single molecule sequencing as that term is used in the claims of this patent? And so when we look at this patent, I understand your point, which I think makes some sense, which is if we can say point of novelty, the point of novelty here isn't the specific kind of sequencing, whether it's by synthesis or by something else. Okay, you get it. It's the idea of using this linker, this hairpin to create this single strand out of an ordinary double strand. But the question is that doesn't mean that we have a rule under the law that an inventor can't characterize something in the prior art in a new, different way for the inventor's own purposes. And so the real question is how did this applicant, this inventor, use the term single molecule sequencing? Because of 2008, 2009, right? Right. So it's really not subject to dispute that single molecule sequencing means sequencing a single molecule. So we're starting from the premise of adding in a limitation because it's – in fact, that was what the prosecution history said is this only makes sense. This idea of using the hairpin only makes sense if you're doing one molecule at a time. If you're doing a group to just figure out what the group does, then keeping the integrity of the two pieces together doesn't have any value. That was what the declaration stated in the prosecution history. So everyone was focused single molecule sequencing versus non-single molecule sequencing. The examiner relied on unexpected benefits of something that ITC held isn't within the scope of the claims. So a person reading the file history would clearly recognize that. But more importantly, the patent was granted with everyone knowing. There's the pending claims which create a presumption that single molecule sequencing is a broader term. There's the – What do you mean everybody recognizing? I mean, first of all, your expert's declaration does not say what the understanding of single molecule sequencing terminology was back in 2008 and 2009, right? It's the admission of the other side's expert that the standard terminology – No, no, but you stick with me. Okay. I'm with you. Okay? In the statements, in the declaration submitted in prosecution, your expert did not address the meaning of that terminology in 2008, 2009, correct? Disagree. He put in two references, GUPTA and POSTMA, to show the meaning, and both were prior art references. So he specifically showed how the meaning in the art was. I totally disagree with that. The whole point of the declaration was to say nanopore sequencing was known as one of the species of single molecule sequencing, and GUPTA and POSTMA are intrinsic evidence of what nanopore sequencing has at the time. And he said this is what single molecule sequencing covers. It covers this, and then you cite – Okay, so you're getting from the citation of these references that it was the same in 2008, 2009. Okay, but we have a series of cases, Biogen, there are others, which say that statements by the patentee trying to expand the scope of a claim during prosecution are not to be given any weight. How do you deal with that? I deal with it simply. The opposing expert, point blank, said the standard terminology in the art was that – Okay, but you keep shifting to a different point. I'm talking just stick with the prosecution. Yes, I'm not – Why under these cases should we give any weight to a statement expanding the scope of the claims during prosecution by the patentee when the cases say that we shouldn't do that? Let me be clear. Because there's so much supporting evidence for the basic proposition that it's just further evidence that everyone's on notice. So you agree then we have to find support for your position outside of those statements in the prosecution history? I don't think any one piece of evidence here carries the day, and I definitely don't think that what the decision's based on – I mean, what are we adding in the face of all this evidence, the presumption against the interpretation, the fact that the patent was granted based on an embodiment that's outside of the construction, the definition in the file history under oath supported by prior art, the plain meaning single-molecule sequencing doesn't have a synthesis step, the fact that the claim's long and has all kinds of other claim steps that are not sequencing. In view of all that, what is the real basis? The real basis is a sentence with the present invention that's as generally broad and particularly preferred embodiment. I can see in the ALJ focused on more than just a single sentence. And if only there was a single sentence, then I understand your point. But the spec is quite pervasive and repetitive in its discussion of synthesis, and it seems to devote a lot of attention to discussing a lot of different processes within the ambit of synthesis. And the summary of the invention repeatedly talks about synthesis. And so I guess one could arguably have a takeaway from reading the summary and then the opening columns of the detailed description that this inventor was entirely devoted to the idea of doing the sequencing through synthesis. And I think that's what was the hook for the ITC. And as we all know, the specification is the single best guide to understanding the claim. And so even if a particular claim term had an established meaning, an established technical meaning at the time of invention to skilled artisans, there's nothing stopping an applicant from recharacterizing that established meaning to mean something specific for his own purposes in a patent. And I think that's the focus of the debate here, and that's something we need to hear your answer on. My answer on that is the gestalt of the patent is this would be the high watermark for this. Forget about all the other evidence I just recited, and it's the gestalt. What I'm saying is there's a lot of different inventions in here, so the repetition of synthesis could relate to a lot of things. What's important is that everyone agrees the invention is independent of synthesis step, and the patent does have the column seven discussion, which says, although described in terms of the specific smart sequencing process, the sequencing compositions of the invention, which include the hairpin, the nucleotide analogs may be detectable by any of a variety of different mechanisms. And then the sentence keeps going. There's no period there. It says including the presence of fluorescent dye labels coupled to the nucleotide through a beta, et cetera, et cetera. And then the rest of it seems to be, again, turning us right back into the world of synthesis. There's no word synthesis there. I don't agree with that. And then it cites nanopore sensors and then cites an article that everyone agrees – not everyone agrees. The ITC agrees, discloses regular nanopore sequencing without synthesis. So he cited an example of nanopore sequencing, single-molecule sequencing without synthesis. Like how much do you – I mean I've given about seven sources of evidence that tell you this should be more. Mr. Reynolds, is – Dr. Ehrlich is your expert, right? Yes. Do you agree with his test that his testimony was that in 2008, single-molecule sequencing didn't have a well-established meaning and it wasn't until maybe 2011? Absolutely not. And the fact that the ITC relied on that for that proposition tells me that that was result-oriented, I hate to say. Because if you look at it – Well, I went and looked at the testimony and he says, hmm, 2010, 11. He says that there was error – the question was whether there was no one about error rates. The question had nothing to do with definitional. And he said the commercial systems weren't out there so that you wouldn't have an appreciation for the error rates at that point. And there's additional testimony where he makes that real explicit. But if you look at that, you'll see. I'd like to reserve my time. I do, but I'll do it when he comes back up. Did you have something more? Yeah. Would labels be used in non-synthesis? There's so many ways you could use it. I would say not traditionally just to be responsive. But I definitely wouldn't preclude the possibility that labels could be used in a system where you're cleaving the bases as they go through. I mean, I assume that you actually could probably do it that way. So I think looking at the actual literature that's cited, which shows what's consistent with the art, including the intrinsic prior art in the record, is a better way to determine what is intended by a non-reverse sensor. I'm going to read to you from 406, which is what I had looked at. That's 5983, Depo, page 406. I would say that before the person of general skill in the art was actually really aware, you know, of single molecule sequencing and aware of that type of thing probably was another couple of years. It probably would have been like 2010 or something like that, maybe 2011. That type of thing being the error rate. You know of single molecule sequencing. That type of thing. We could all read it, but in view of all the literature, everything else, to rely on that to contest their own experts said the standard terminology in the art in 2008-2009 was that single molecule sequencing encompassed nanopore. It's a single molecule. What else is there? I mean, it's not really debatable that single molecule sequencing encompasses nanopore. I guess if it weren't debatable, we wouldn't be here. No, it's the reliance on the, if you actually read the opinions, it's the over-reliance on the present invention sentence. It's not a serious statement. They just say that the extrinsic evidence is ambiguous. They're not denying that nanopore sequencing means single molecule sequencing. I'll look at the prior. I looked at that block in his testimony. I'll look at the prior language to see if it goes. Look around and you see that it's referring to a commercial system. He's like the commercial systems are out. That's when people knew about the error rate. That's a total misuse and that records an avalanche on the other side. All right. We'll give you two minutes for rebuttal. Thank you, Your Honor. Ms. Nayella. May it please the court. I'd like to start where Judge Wallach ended at, at appendix page 5983, regarding Dr. Packbio, the testimony of Packbio's expert, Dr. Erlich. The question was asked whether or not single molecule sequencing is error prone in 2008, which is the claim priority date for the independent claims at issue here. At page 405, Dr. Erlich responds at line 25, responds, yeah. He answers the question. Then he proceeds to add, although most people really didn't have an understanding of single molecules, unless you were on the leading edge, continuing on to page line 5, most people didn't have much of a sense of a single molecule at all. Line 8, I would say that before the person of general skill in the art was actually really aware, you know, of single molecule sequencing and aware of that type of thing, probably was another couple of years. So a couple of years after 2008, the time of the invention here, there was no well-established meaning of the term single molecule sequencing. What about the other side's expert? The other side's expert. That very, very clearly proclaimed that nanopore sequencing was a known, understood way of performing single molecule sequencing as of the time of the invention. That's reinforced by the prior art references cited on the face of this patent, Gupta and Postma. I'm not saying anything wrong, am I? Well, Oxford's expert. Am I saying something wrong? Oxford, I wanted to clarify that statement. Oxford's expert testified as to the standard terminology of the term in the period of 2008 to 2009. Now in 2008, single molecule sequencing and nanopore sequencing were nascent technologies. So we have these references to Gupta and Postma. Those were all published months after March 2008. And if you actually look at Gupta and Postma. So I'm trying to understand. The other side's expert acknowledged that single molecule sequencing encompassed nanopore sequencing as of the time of this invention. Is that fair? I understand you want to say it was nascent technology. That's fine. But nevertheless, he said what he said. I believe it's 2008 to 2009. While it may cover the time of invention, it is not limited to the time of the invention, which is March 2008. So at the time of March 2008, nanopore sequencing and single molecule sequencing was not customary. It was not a customary term. And it was through the year, through the months, spanning into 2009 where there became a better understanding of the term. Is that what the expert said? I don't remember the expert saying it like that. If we look at appendix page 5432. At page 86 of Dr. Romsberg's deposition. At lines 10 through 15. The question was, to a person of ordinary skill in the art, in the 2008 to 2009 time period, in terms of the standard terminology in the art, single molecule sequencing would encompass nanopore sequencing. Correct. Yes. So the point here is that at the time of the invention, March 2008, which is the claim priority date for the independent claims which recite the single molecule sequencing term. The question says 2008 to 2009. You're suggesting that excludes March 2008? No, I'm suggesting that over that range, there may have been a better understanding of the terms single molecule sequencing. But it certainly was not the case. Let's just say hypothetically I don't agree with this. Move on to your next argument. So it strikes me that the problem here, as Judge Chen was suggesting, is we seem to have potentially conflicting testimony as to whether there was a well understood meaning to single molecule sequencing as including nanopore sequencing in the relevant time period. What are we to do if we find that the record is conflicting about that? Well, we have this conflicting testimony as to what was the customary meaning of the term. And so that is why it is much more important here to refer to the specification to determine how the patentees used the term in the context of the patent at the time of the invention. And the specification here of both patents clearly and consistently describe single molecule sequencing as requiring template-dependent synthesis. The independent claims require single molecule sequencing of a template molecule. The use of the term template molecule as opposed to merely a molecule suggests that a molecule serves as a template for generating… No. So that doesn't move the ball in any direction whether nanopore sequencing is encompassed or not encompassed. Just the fact that it says a template sequence, a template molecule. But in nanopore sequencing, as the administrative law judge found and the parties do not dispute, nanopore sequencing is substantially different than template-dependent synthesis because it does not involve synthesis of a complementary strand. So the claim language itself, which suggests synthesis of a template molecule, means that nanopore sequencing would not be encompassed. You're assuming the conclusion by assuming that something in the claim language itself is driving us toward synthesis. The real question is whether this inventor did something to truly constrain and characterize the meaning of single molecule sequencing to be put within the context of synthesis and synthesis only. That's really the debate here. And we're not solely relying on the claim language here. It simply supports the commission's construction and the inventor's description of their invention in the specification. What do we make of the citation to Clark in the specification in the part that Mr. Reines was reading? The citation to Clark is simply for the purpose of supporting the patent's disclosure of using a nanopore sensor to detect nucleotides in a synthesized strand that are incorporated into a synthesized strand. Clark describes a very different process that destroys a DNA strand and does not use labels. Those disclosures are not referenced at all in the specification and, moreover, are incompatible with embodiments described in the specification. So this notion that the specification refers to nanopore sequencing in Clark is just not there. There's no mention of nanopore sequencing at all. Clark doesn't talk about nanopore sequencing? Yes, it does. Clark does. The specification does not. And it does not do so by simply citing to Clark and stating that nanopore sensors are used for detecting incorporated nucleotides. I guess the question is should the reference to Clark, the citation to Clark, be understood as doing something more than just discussing using a nanopore sequence in the context of synthesis but, in fact, is communicating to the reader that the inventor is actually thinking about what Clark is actually disclosing, nanopore sequencing. I don't believe an inference like that can be made here for claim construction. We have Clark, which describes a very different invention, and it's this court held in Trustees of Columbia. A cited reference that describes a different invention is not relevant to claim construction. So is the idea here that Clark is cited for the use of nanopore sensors rather than nanopore sequencing? Yes. And using the nanopore sensor for detection purposes is different than nanopore sequencing as the parties are using it. I'm just curious. How is it different? I mean, you're feeding a strand through the nanopore sensor, and that sounds like nanopore sequencing. It is simply pulling the strand to detect a nucleotide to identify what that nucleotide is. Nanopore sequencing involves determining the order of a series of nucleotides in a row. And the prior art, if you look at Gupta, Postma, Clark, talks about the difficulty in March 2008. Actually, those references are post-March 2008. I'm just trying to understand how Clark is being referred to and used in the mention of its nanopore sensor in column 7. What's happening in column 7? Is there a DNA strand being fed through a nanopore sensor? Or you seem to be suggesting there's just a single base that's being fed through the nanopore sensor. That doesn't sound right to me. To understand what column 7 is, you simply have to look at what the specification says. Okay, well, help me. Tell me what is that? The paragraph starts off where we have this reference to Clark that it will be appreciated that in accordance with the sequencing compositions of the invention, the nucleotides or nucleotide analogs may be detectable by any of a variety of different mechanisms. And going to that specific sentence with the reference to Clark, likewise, non-optical labels may be employed, such as highly charged moieties, that may be detected by electrical chemical systems such as, for example, nanopore sensors. That's it. No mention of nanopore sequencing and what it takes to— Can you just translate for me? I understand what those words are, but what are they teaching us? Are you feeding a DNA strand through a nanopore sensor? It says that you're using a nanopore sensor to detect the nucleotides that are going through the nanopore. That's just one step. Why isn't that nanopore sequencing? Because detection is simply one step of the sequencing process. There are other steps to it. What else is going on in nanopore sequencing other than the act of running a DNA strand through the sensor? You have to pull— And then identifying the individual bases. You need to pull the strand to the next nucleotide and detect that nucleotide and do that over and over again to get a sequence, the identification of a number of nucleotides in a row. Just detecting one nucleotide does not get you a sequence. And the prior art talks about the difficulties from going from detection to sequencing. Your position is column seven is only about feeding a single nucleotide into the sensor, nanopore sensor. That's correct. Nanopore detection purposes only. Okay, let's hear from Mr. Hash. No, not yet, Mr. Reines. Nice try, Mr. Reines. Too eager. Good morning. Stephen Hash on behalf of one of the leaders of Oxford Nanopore. If I could address Judge Chin's issue. Your last question to Mr. Reines was— My last question to your co-counsel over there. Okay. Column seven, it's just a single nucleotide that's being fed through that nanopore sensor in column seven? No, no, no. Column seven talks about labels and how to detect labels, non-optical labels. And it says the way you detect non-optical labels is by ChemFET or nanopore sensors. For example, ChemFET or nanopore sensors. Your question about labels is very pertinent to that. Labels are only used in synthetic processes. No, but paint for me a picture of what's happening with the nanopore sensor from Clark in the context of column seven. What is being fed through the sensor precisely? Clark doesn't use labels. It only talks about sensors. No, I'm asking you to paint a picture for me. What is happening when you use the nanopore sensor in Clark? What is the specification telling us? But you're conflating Clark and nanopore sensors. The sentence is non-optical labels can be used with nanopore sensors. Clark doesn't talk about labeled nucleotides. Clark is a destructive process. The labels aren't nucleotide. The citation is solely for the purpose that Clark discloses nanopore sensors. It doesn't talk about detecting labeled nucleotides. That is just the patent. And to your question, labels are only used in synthetic processes. The purpose of synthesis with a polymerase is you incorporate a labeled nucleotide. Now that takes me to the question of why did the patent refer to Clark and Clark's nanopore sensor? Because – There has to be something we take away from it. What is it? It's a simple citation to the use of nanopores as sensors. For what purpose in the context of this patent? To detect something. Here what they're talking about is detecting labels. What's a label? A label is something that you put on a nucleotide, and when it is incorporated into the growing strand by a polymerase, that label does something. In the context of a fluorescent label, the label is cleaved off and there's a little flash of light. And so that's what everything before is talking about. As Mr. Reines, as PacBio admitted at the Markman hearing, the only embodiments – he gave us credit for this. Our argument is that the only embodiments, the only thing that's disclosed in this patent, the present invention language, every embodiment, every example, not just the smart sequencing, everything is synthetic. There is no disclosure of non-synthetic processes. When you look at the sentence, it's context-dependent. So you're saying that the nanopore sensors are used here as part of a synthetic process? Yes, Your Honor. That's exactly correct. And that question was asked of Dr. Ehrlich, who is – I thought you answered my question by saying, no, you can't use a nanopore sensor with a synthetic process. No, you can use a – Clark doesn't use the nanopore sensor in a synthetic process. This patent contemplates the use of labels, and the only reason you use labels is because of a synthetic process. Okay, so explain to me how this patent uses a nanopore sensor in a synthetic process. What are you actually doing? So what it's contemplating is the synthesis of a strand with labeled nucleotides. So the polymerase is synthesizing the strand and incorporating the labeled nucleotides. They use non-optical labels like a metal or a molecule that has a specific signal when it goes through the nanopore because the nanopore just detects differences in current. So you're using the sensor to determine what the label says? You're using the sensor to detect what the label is. And so a G will have this – a G will have a label on it that creates a specific signal. A T will have a label on it that creates a specific signal. A label is on the end of a – Is on the bit? Is on the nucleotide. So the polymerase is just making a copy, and that's what – as Ms. Noelle was talking to you, the template. The template here, the claim talks about a template. A template is something that is copied. And so the claims use of the word template is very relevant here because when you talk about a synthetic process,  You're making a copy. And so the language of the claim gets this idea of you're taking a DNA strand and making the whole DNA strand into a template by adding that linker on, which creates just one issue that I want to just address. Mr. Reines makes the argument that that template is somehow novel, that nobody ever thought about that. People have been using that type of template for decades. It is not something new. It is not something non-obvious. Wait, you're talking about the hairpin? The hairpin. Annealing hairpins onto DNA structures. His attorney argued that that template is somehow novel, not obvious. That's been around for generations. Frederick Sanger, in his Nobel speech, said you want to sequence both strands. It's accepting the Nobel Prize for DNA sequencing. Is this in the record? Is this in the record? I'm not sure it's in the record. Okay. I mean, this is not a jury box over here. Sure. But these structures are not novel. They're not new. They're not obvious. There isn't any great innovation here. This is a new argument that they're presenting. Okay, you're now trying to make an invalidity analysis here. We're trying to understand how to understand the meaning of single-molecule sequencing. But to your point, and to continue with the sensor, the sensor would detect whatever that label is. It is a molecule that is going to create a specific change in the current as it is synthesized and progresses through the nanopore sensor. And so that label is going to – for the nucleotides as they're incorporated, because each nucleotide, as it's incorporated, is going to have a different label on it. The G's will have one label. The T's will have one label. The C's will have one label. And the A's will have one label. And as the synthesis is created and as those nucleotides are added into the strand and it progresses through the nanopore, according to what the patent is saying or contemplating, you'll get a different signal. But that is a synthetic process. The context of those statements – Mr. Reines' argument that the patent contemplates anything but the synthetic is wrong. He conceded that at the Markman hearing. Okay, but what about your expert's testimony about the meaning of single-molecule sequencing? I think that was made in error, and it isn't specific to the timeframe we're talking about here of 2008. It spans through 2009. Were you at that deposition? At the Goldman deposition? Yeah. I was not. I was at the Ehrlich deposition, and I asked the question. I'm just wondering why somebody didn't say objection, foundation, vague, ambiguous, et cetera, et cetera. I will talk to the person who yields the deposition about that. So you're asking us to not give credit to your own expert's testimony that at the timeframe of 2008-2009, single-molecule sequencing encompassed nanopore sequencing? But it is timeframe-dependent, and it's 2008, not 2008-2009. As Dr. Ehrlich was saying— I guess you're saying 2008-2009 doesn't encompass March 2008. But it also encompasses December 2009, and by December 2009— Right. What if it said 2008-2018? It's ambiguous. Well, suppose we disagree with that. Suppose we think that there's a real conflict here in the testimony. I think that the record as a whole is not, as Dr. – I mean is not, as Mr. Ramos says. There's a great deal of conflict, and I think that there's deference that should be accorded in the factual determination that was made by the commission here. They've looked at the record as a whole, and you look at the references that are cited by PacBio. That's seven references out of the thousands of references that talk about DNA sequencing, and they cherry-pick them. And the fact is— Well, we don't give deference to them to the extent that they're interpreting the intrinsic evidence, only the extrinsic evidence. And I'm not sure that there's a finding here by the ITC about the extrinsic evidence. There is. PacBio's argument is that the plain and ordinary meaning controls – that the extrinsic evidence dictates this plain and ordinary meaning. It's a very Texas Digital-esque argument. And I think what's illustrative if we look at the cases is a case like Nystrom where the court in pre-Nystrom, pre-Phillips in Nystrom, looked at a dictionary definition, looked at extrinsic evidence and said a board is wood and other materials based upon the extrinsic definition of what a board is. That was contrary to what the patent said, what all the embodiments were, what the present invention language. Post-Phillips, the Nystrom court came back and said Phillips dictates that we look at the specification. The specification is the single best guide. They've acknowledged that there is not a single embodiment. The present invention language here is unequivocal. Mr. Raines acknowledged that the present invention language talks about nothing more than template-dependent processes. So what statement in the specification disavows or disclaims anything other than synthesis? As the court in Regents said, we believe that the language, the present invention language, the repeated present invention language rises to the level of a disavowal. But the court didn't need to get to a disavowal. As the court in Regents of Columbia University said, a disavowal, when the specification makes it clear that this is what the invention is, that you don't need an express disavowal. You don't need a disclaimer. It doesn't have to be expressed. It can be implied. That's fine. But what is the evidence here? The evidence is repeated characterization of the invention. All the embodiments are consistent with this. A person of ordinary skill in the art cannot read this specification and believe that the invention that's being described is anything more than an application of a well-known template in template-dependent processes. As retractable technology said, the claim scope is tethered to the specification. There is no reading of this specification. Contrary to this revisionist argument that Mr. Reines is making now, as he said, all of the embodiments, every single one, the general and particular language, the primary embodiments, the other embodiments, all of the examples are template-dependent synthesis. Okay. I think we're out of time. Thank you, Mr. Harris. I'd like to just clarify my response to Judge Dyke. The Turner Declaration, which was submitted multiple times, refers to Gupta, goes through the history of DNA sequence, says Gupta provides a review specifically describing the various single-molecule sequencing approaches in 2008, which include helicose, PacBio, and nanopore sequencing. And he does, and he says nanopore sequencing is single-molecule sequencing. It's not a vague thing. And then he said, then after analyzing literature, he says, thus as described above, the term single-molecule sequencing is well understood in the field at the time of the invention to mean carrying out and states it. So the evidence of the standard usage is the square admission of their own expert, the declarations documented with prior art, every prior art reference. We put seven in, extrinsic, and then the two intrinsic, and they use single-molecule sequencing with respect to it. Now getting to Judge Dyke, I think the ultimate point here is the IDC punted on actually facing what the plain meaning was. They just kind of went through and then cited this really, I think, unfair statement from Dr. Ehrlich about errors in it and commercialization to overcome all of that. And it says, well, therefore, voodoo on a whole, we find that extrinsic evidence doesn't support us, which is a vague statement. It doesn't grapple with the plain meaning in the field, which I think is a critical bedrock. On the actual specification itself, I want to make two points. The first point is everything that Mr. Hash said about how you can have synthesis with nanopore sequencing isn't consistent with that same body of evidence that I just gave you, which you can go through or have your clerks go through. Statin nanopore sequencing has always been non-synthesis. So his story of how you might do it is based on nothing at all. The other thing I want to say is if you go to column 9 and 10, there's a bridge of 9 and 10, it describes this concept of the hairpin invention. And it describes it, and it doesn't have anything to do with synthesis. It goes through and it says you take one, you take the other, you put it in between, and then you can do them both at the same time. It doesn't care how it goes through the sensor and what happens. And so that's the part. You can't look at it. To me, it's an omnibus specification. And to say, well, a lot of stuff's about synthesis, therefore this aspect of it, which is synthesis independent, has to be limited when the claim scope isn't that way and that wasn't how it issued, just doesn't seem like how we should be doing this, especially since people rely on the text of the claim scope. Okay. Thank you, Mr. Reines. Thank you very much. Thank you both. Thank you to all council cases submitted.